# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### Green Bay Division

| | |
|---|---|
| JESSIE ESPINOZA, AUSTIN BUSHONG, JULIAN GRIFFIN, MD JAHIRUL ISLAM, and RUBIN STONE, *on behalf of themselves and all individuals similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT VANZILE, JR., ROGER MCGESHICK, JR., SONYA SMITH, MAIA KEGLEY, LEELYN VANZILE, CALEB MCGESHICK, and JOHN DOES 1-25,<br><br>Defendants. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT

Plaintiffs Jessie Espinoza, Austin Bushong, Julian Griffin, Md Jahirul Islam, and Rubin Stone ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## INTRODUCTION

1.      This case arises from the making and collection of unlawful loans from online lending entities *purportedly* owned and operated by the Sokaogon Chippewa Community of the Mole Lake Band of Chippewa Indians (the "Tribe"), a federally recognized Native American tribe. These loans impose triple-digit interest rates, exponentially higher than the interest rate cap permitted by laws in nearly every state.

2.      For example, although California law caps the interest rate on loans issued to its residents, including Plaintiff Jessie Espinoza, at 12 percent, Cal. Civ. Code § 1916-2, an entity

purportedly operated by the Tribe—Post Lake Lending Inc.—issued a loan to Mr. Espinoza with an interest rate of 777.86%, **more than 64 times** the lawful limit.

3. The loans issued by Defendants' usurious scheme are similarly illegal in Florida, Missouri, and Kentucky—the states in which Plaintiffs Griffin, Islam, and Stone resided when they obtained their loans.

4. Seeking to ostensibly avoid state usury laws, Defendants established what is commonly referred to as a tribal lending business model—"the most recent incarnation of payday lending [companies'] regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012). Under this model, non-tribal payday lenders originate their loan products through a company "owned" by a Native American tribe and organized under its laws. The tribal company serves as a conduit for the loans, facilitating a dubious and legally incorrect claim that the loans are subject to tribal law, not the protections created by state usury and licensing laws. In exchange for the use of its name on the loan, the tribal company often receives only a small portion of the revenue and does not meaningfully participate in the day-to-day operations of the business.

5. And regardless of the tribe's level of participation in the operations, the loans are illegal because it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). In other words, as explained by the Fourth Circuit, "substantive state law applies to off-reservation conduct," such as the online loans marketed, collected, and paid by consumers in California and other states here. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021). And

2

"although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Id.*

6. Despite the overwhelming authority regarding the illegality of these loan products, Defendants made, collected, and/or received interest from high-interest loans originated in the names of Post Lake Lending, Inc. ("Post Lake"), White Pine Lending ("White Pine"), and Advance Loan Solutions ("Advance Loan") (collectively with all other lending entities established by the Tribe, the "Tribal Lending Entities" or "TLEs"). These entities were formed under tribal law to serve as fronts for lending in a now-debunked attempt to evade state usury protections.

7. Upon information and belief—and based on discovery in countless other tribal lending cases brought by Plaintiffs' counsel—despite the ostensive connection to the Tribe, non-tribal members handle significant parts of the TLEs' operations and provide the capital used to make the entities' loans. In return, these non-tribal coconspirators receive the vast majority of the profits of the illegal lending enterprise.

8. Defendants Robert VanZile, Jr., Roger McGeshick, Jr., Sonya Smith, Maia Kegley, and Leelyn VanZile (the "Tribal Council Defendants") are members of the Sokaogon Chippewa Community's Tribal Council. Although they may be motivated by a desire to advance their own community, their effort to advance themselves exploits desperately poor people in other communities who, in their moment of despair, agree to take a small dollar loan with triple-digit interest rates. The Tribal Council members' consent, authorization, and participation is a necessary and instrumental component of the illegal lending enterprise, including the creation of the illegal loans. Without the Tribal Council Defendants' participation and oversight, these entities would not exist and could not purport to be authorized by a tribe to make loans in violation of state usury laws.

9.	In addition to the Tribal Council Defendants, Plaintiffs also seek relief from a group of yet-to-be-identified coconspirators—the John Doe Defendants—whose identities will be revealed through discovery into the TLEs' operations.  Upon information and belief—and based on discovery in other tribal lending cases—the John Doe Defendants are non-tribal individuals who run the majority of the day-to-day operations of the TLEs, including funding, underwriting, operating, staffing, and servicing the loans issued by each entity.  They also reap the vast majority of profits from the TLEs' operations.

10.	Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452; *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990) (explaining that RICO "makes it unlawful for 'any person'—not just mobsters—to use money derived from [the unlawful collection of debt] to invest in an enterprise, to acquire control of an enterprise through [the unlawful collection of debt], or to conduct an enterprise through the [unlawful collection of debt]").

11.	Plaintiffs also assert a class claim for violations of state usury and consumer protection laws, seeking to enjoin the Tribal Council Defendants, in the official capacities through which they control and sanction the TLEs' operations, from allowing the further collection of the unlawful and void loans. Plaintiffs further seek deletion of any credit reporting associated with the loans, such as reporting creating the appearance that the loan balances are unpaid or outstanding.

12.	And Plaintiffs seek declaratory relief that their loans are void and unenforceable under the laws of their respective states and every other state in which the loans are usurious and/or prohibited by the relevant state's licensure laws.

## JURISDICTION

13. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14. The Court also has jurisdiction over Plaintiffs' state law claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are members of the classes defined below that are citizens of different states from any defendant and the amount in controversy, in the aggregate, exceeds $5,000,000, exclusive of interest and costs.

15. Indeed, in every tribal lending case brought by Plaintiff's counsel, the amounts in controversy have far exceeded $5 million, as the amount of the loans often reach into the hundreds of millions and even billions of dollars. *See, e.g.*, *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 Final Approval Order, Dkt. 201 (W.D. Va. Dec. 17, 2024) (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order, Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order, Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order, Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order, Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order,

5

Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million).

16.     Upon information and belief—and based on discovery in every other tribal lending case to date—the outstanding balances of the loans issued by each of the TLEs far exceeds $5 million, especially when considering the millions in additional interest allegedly accruing on the triple-digit loans.  Even with respect to the individual states, moreover, Plaintiffs allege and believe based upon their prior cases that the outstanding balances of the loans issued by the TLEs in just one of the states in which they operate exceeds $5 million in the aggregate, especially when including the additional interest.

17.     The state law counts in this case seek to enjoin further collection of these outstanding balances and, thus, the measure of the amount in controversy (i.e., the value of the injunctive relief) is at least as much as the outstanding balances on the loans issued by each of the TLEs in each respective state.  The Court therefore has jurisdiction over the state law counts under CAFA, independently of Plaintiffs' RICO claims.

18.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2) because Defendants have transacted their affairs in this Division and District and a substantial part of the events from which Plaintiffs' claims arise occurred in this forum, where the Tribe's reservation is located and in which the conduct of the Tribal Council Defendants described in this Complaint largely occurred.

## PARTIES

19.     Plaintiff Jessie Espinoza ("Espinoza") is a natural person and resident of California.

20.     Plaintiff Austin Bushong ("Bushong") is a natural person and resident of California.

21.     Plaintiff Julian Griffin ("Griffin") is a natural person and resident of Florida.

6

22. Plaintiff Md Jahirul Islam ("Islam") is a natural person and resident of Missouri.

23. Plaintiff Rubin Stone ("Stone") is a natural person and resident of Kentucky.

24. Defendant Robert VanZile, Jr. ("VanZile, Jr.") is the Chairman of the Tribal Council of the Sokaogon Chippewa Community. As Chairman, Defendant VanZile Jr.'s duties include the chartering and oversight of the Tribal Lending Entities.[1] In performing these duties, Defendant VanZile, Jr. meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation, licensing, and ongoing authorization of the TLEs; the appointment and removal of the board members of the TLEs; and approval of agreements between the TLEs and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seek an injunction and declaratory relief against Chairman VanZile, Jr. in his official capacity.

25. Defendant Roger McGeshick, Jr. ("Vice-Chair McGeshick") is the Vice-Chairman of the Tribal Council of the Sokaogon Chippewa Community. As Vice-Chairman, Defendant McGeshick's duties include the chartering and oversight of the TLEs. In performing these duties, Defendant McGeshick meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation, licensing, and ongoing authorization of the TLEs; the appointment and removal of the board members of Post Lake; and approval of agreements between the TLEs and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seek an injunction and declaratory relief against Vice-Chair McGeshick in his official capacity.

---

[1] Although Post Lake itself may claim to be entitled to immunity, the Supreme Court has held that "tribal immunity does not bar" a "suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

26. Defendant Sonya Smith ("Smith") is the Treasurer of the Tribal Council of the Sokaogon Chippewa Community. As Treasurer, Defendant Smith's duties include the chartering and oversight of the TLEs. In performing these duties, Defendant Smith meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation, licensing, and ongoing authorization of the TLEs; the appointment and removal of the board members of the TLEs; and approval of agreements between the TLEs and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seek an injunction and declaratory relief against Ms. Smith in her official capacity.

27. Defendant Maia Kegley ("Kegley") is the Secretary of the Tribal Council of the Sokaogon Chippewa Community. As Secretary, Defendant Kegley's duties include the chartering and oversight of the TLEs. In performing these duties, Defendant Kegley meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation, licensing, and ongoing authorization of the TLEs; the appointment and removal of the board members of the TLEs; and approval of agreements between the TLEs and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seek an injunction and declaratory relief against Ms. Kegley in her official capacity.

28. Defendant Leelyn VanZile ("VanZile") is Councilman I on the Tribal Council of the Sokaogon Chippewa Community. As a councilman, Defendant VanZile's duties include the chartering and oversight of the TLEs. In performing these duties, Defendant VanZile meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation, licensing, and ongoing authorization of the TLEs; the appointment and removal of the board members of the TLEs; and

approval of agreements between the TLEs and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seek an injunction and declaratory relief against Mr. VanZile in his official capacity.

29. Defendant Caleb McGeshick ("Councilman McGeshick") is Councilman II on the Tribal Council of the Sokaogon Chippewa Community. As a councilman, Defendant McGeshick's duties include the chartering and oversight of the TLEs. In performing these duties, Defendant VanZile meets regularly with other members of the Tribal Council to review, perform, and implement high-level management of the TLEs, including but not limited to the creation, licensing, and ongoing authorization of the TLEs; the appointment and removal of the board members of the TLEs; and approval of agreements between the TLEs and nontribal coconspirators. Based on the misconduct alleged herein, Plaintiffs seek an injunction and declaratory relief against Councilman McGeshick in his official capacity.

30. Defendants John Doe Nos. 1–25 are unidentified parties who participated in the enterprise with the Defendants, including but not limited to entities and individuals who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

**FACTUAL BACKGROUND AND ALLEGATIONS**

**A.** **State usury and licensing laws protect consumers from usurious loans.**

31. "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

32. Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders.

9

### i.   California

33.   By way of example, California has several usury regulations and licensing requirements for consumer lenders like Post Lake.

34.   Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872.  Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381, 1381, 1385 (1966).

35.   Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

36.   Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

37.   "California state law currently limits the amount collected on a loan to "twelve dollars upon one hundred dollars for one year," or 12 percent.  Cal. Civ. Code § 1916-2.  "Any agreement or contract of any nature in conflict with [the interest rate cap] shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed." *Id.*

38.   Thus, "[a]n interest rate in excess of [12%] is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender

will have no action at law to recover any interest." *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1164 (citing Cal. Civ. Code § 1916-2).

39. California law further provides that any person who pays any amount exceeding the interest-rate cap may recover "treble the amount of the money so paid or value delivered in violation of said [cap]." Cal. Civ. Code § 1916-3(a).

40. California has also deemed the willful lending of usurious loans without a license a felony "punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year." Cal. Civ. Code § 1916-3(b).

41. In addition to abiding by California's usury cap, lenders issuing loans to California residents are also required to obtain a license under the California Financing Law. *See* Cal. Fin. Code §§ 22000*, et seq.*

42. Even if licensed, moreover, a licensee is still limited in the interest rates it can charge based on the unpaid principal balance remaining. *See* Cal. Fin. Code § 22303 (setting, for example, a "two and one-half percent per month" rate maximum on "that part of the unpaid principal balance . . . up to, including, but not in excess of [$225]," while limiting the rate for the portion between $225 and $900 to 2 percent, and the rate for $900-$1,650 to 1.5 percent).

43. Loans willfully issued by even unlicensed lenders in violation of these requirements are deemed "void" and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750.

44. Those who willfully violate the licensing requirements are also subject to fines and imprisonment. Cal. Fin. Code §§ 22753, 22780.

45. California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1166 (quoting *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

46. Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

**ii. Florida**

47. Florida has enacted usury laws that prohibit lenders from making high interest loans.

48. The Florida legislature passed laws prohibiting usury as early as 1822, before Florida even became a state in 1845.[2] As the Florida Supreme Court noted: "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

49. Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

50. Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest

---

[2] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_su mmary_r&cad=0#v=onepage&q&f=false.

exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1).

51.     If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

52.     Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758–59 (Fla. 1935).

53.     The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

### iii.     Missouri

54.     Missouri limits the interest rate on a written contract to 10 percent or the prevailing market rate at the time of the contract, whichever is higher.  Mo. Ann. Stat. § 408.030(1).

55.     Missouri permits borrowers of usurious loans to obtain "all sums of money paid in excess of the principal and legal rate of interest of any loan," as well as "the costs of the suit, including a reasonable attorney's fee to be determined by the court."  *Id.* § 408.050.  Further, lenders are barred from recovering any interest on a usurious contract.  *See id.* § 408.150.

56.     Missouri law allows higher interest rates on consumer installment loans—such as the loans at issue here—but only if issued by a lender licensed by the Missouri Division of Finance. *See* Mo. Ann. Stat. § 408.510.  Further, any lender in the business of issuing small-dollar loans, such as the TLEs here, who does so without a license cannot enforce the loan contract, which is deemed "void."  *See id.* § 408.500.2; *see also id.* § 408.505(7)

### iv. Kentucky

57. Kentucky limits the interest rate on loans of $15,000 or less to 19%.  Ky. Rev. Stat. § 360.010(1).

58. The knowing assessment of interest greater than permitted under § 360.010 "is deemed a forfeiture of the entire interest," and any borrower who pays more than the principal amount may recover twice the amount of any interest paid.  *See id.* § 360.020(1).

59. Further, Kentucky law prohibits any "person" without a license from engaging in the "business of making loans in the amount or of the value of fifteen thousand dollars ($15,000) or less" at a greater rate of interest than the usury rate.  Ky. Rev. Stat. § 286.4-420.  Any person who in the business of issuing qualifying loans without a license is guilty of a misdemeanor, and "[a]ny loan contract made in violation of this subtitle shall be void and the lender shall have no right to collect any principal, charges or recompense whatsoever."  *Id.* § 286.4-991.

### xii. Other State Usury Laws.

60. Each state of residence of the putative class members also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[3]

---

[3] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ariz. Rev. Stat. Ann. § 44-1201-1204; Ark. Const. Art. XIX § 13; Cal. Civ. Code §§ 1916-2, 1916-3; Cal. Fin. Code §§ 22750, 22753, 22780; Colo. Rev. Stat. §§ 5-2-201, 5-5-201; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.904, 516.02; O.C.G.A. §§ 7-3-1, et seq.; O.C.G.A. § 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009); Iowa Stat. §§ 535.2-535.5; Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.J. Code §§ 31:1-1, 31:1-3; N.M. Stat. §§ 56-8-9, 56-8-3, 58-7-6, 58-7-8, 57-12-10; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.01-1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1), 34-29-10, *et seq.*; S.D. Code § 54-3-1.1, *et*

## B. Overview of the Tribal Lending Model

61. Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

62. Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[4] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

63. Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

---

*seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

[4] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

64. It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

65. Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[5] Others attempted to evade laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

66. In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to try to evade state laws. Martin & Schwartz, *supra* at 759.

67. For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

68. Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

69. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

---

[5] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* 17–22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

70.     Often, at the other side of the table, were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origins of the tribal lending businesses).

71.     Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received a nominal amount of the proceeds from the loans.

72.     Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

73.     Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id*.[6]

74.     In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these illegal loans and returned hundreds of

---

[6] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044, Final Approval Order, Dkt. 201 (W.D. Va. Dec. 17, 2024) (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order, Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order, Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order, Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order, Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order, Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million).

75.     Notably, two prominent perpetrators of these rent-a-tribe schemes were convicted and sentenced to prison for their conduct.[7]

---

[7] *See* United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

76.     Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**C.     The basic structure of the tribal lending model is designed to conceal the role of the non-tribal participants, such as John Does 1-25.**

77.     The tribal lending model revolves around a series of agreements through which the tribe contractually delegates the majority of the responsibilities of the lending entity to third parties.

78.     This is accomplished primarily through a document dubiously labeled a "servicing agreement."

79.     By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

80.     Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.

81.     By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

82.     Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

83.     Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

84. The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5.1.

85. As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶ 3.

86. This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. ¶ 4.

87. By way of another example, this same structure for a transaction was created between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

88. Pursuant to a "Services Agreement" between NPA and Silver Cloud (one of Upper Lake's lending entities), NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 3 at 2264–65.

89. Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

90. Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 4 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

91. The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

92. A similar setup was used for the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 5.

93. In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

94. Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 6.

95. According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

**D. Defendants' lending enterprise lends and collects money at rates that far exceed state usury protections.**

96. Following the emergence of the rent-a-tribal lending model, the Tribe engaged with various non-tribal entities and individuals—the John Doe Defendants—to establish at least three lending fronts that are ostensibly owned and operated by the Tribe: Post Lake, White Pine, and Advance Loan, as well as other yet-to-be-identified lending fronts.

97. Following the same model detailed above, upon information and belief, the Tribal Council Defendants created each TLE by vote of the Council, and they each are responsible for the continuing chartering, approval, and authorization of the TLEs to this day. The Tribal Council Defendants thus control the existence of the TLEs, each of which could not operate without the Tribal Council Defendants' express approval.

98. Post Lake, White Pine, and Advance Loan are each unlicensed in the states in which they operate, and neither they nor the Tribal Council Defendants and their non-tribal coconspirators have ever obtained a license from a state regulator.

99. Despite their lack of any license, and with the Tribal Council Defendants' express permission and authorization, Post Lake, White Pine, and Advance Loan have issued usurious, small-dollar loans to consumers nationwide, each of which has had interest rates in the triple digits, far exceeding the usurious rates of each state in which Plaintiffs and the class members reside.

100. For example, Advance Loan advertises on its website that it issues loans of up to $2,500, which, upon information and belief and based on Plaintiff Bushong's loan from the same company, have interest rates in the range of 300–900%.

101. Post Lake likewise advertises that it issues loans of up to $5,000, each of which also has interest rates between 300 and 900%, as demonstrated by Plaintiffs' loans.

102. And White Pine advertises that it issues loans of up to $1,500 with interest rates between 100 and 800%.

**E.    The Tribal Council's role in the enterprise.**

103. RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4).

104. The Supreme Court's decision in *Boyle v. United States* recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

105. Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

106. Here, the Tribal Council and John Doe Defendants are an association in fact enterprise (the "Usurious Lending Enterprise") who are associated together for the common purpose of making, collecting, and profiting off the illegal loans issued by the TLEs.

107. The Usurious Lending Enterprise has continually existed since at least 2011, when the website for White Pine (the first TLE) was first registered. Meanwhile, the website for Advance Loan was established in 2016, and the website for Post Lake was established in 2022. Upon information and belief, each TLE has issued loans through their respective websites since

their years of creation, and the Tribal Council Defendants, in their official capacities, have been involved in—and have sanctioned—the TLEs' operations since at least their respective dates of creation.

108. Alternatively, each of the TLEs are enterprises in and of themselves under 18 U.S.C. § 1691(4) because they are limited liability companies.

109. The Sokaogon Chippewa Community of the Mole Lake Band of Chippewa Indians is a Native American tribal government that has been federally recognized since its treaty with the United States in 1854.

110. The Tribe's reservation is in Forest County, Wisconsin.

111. The Tribe's Tribal Council serves as its governing body and has the power to make laws and ordinances pursuant to the Tribe's Constitution and laws.

112. The Tribe's Tribal Council is vested with significant power, including the power to create tribal businesses and negotiate with third parties to assist with those businesses.

113. Upon information and belief, the Tribal Council members have the authority to shut down the operations of Post Lake, White Pine, and Advance Loan, as well as any other TLEs, including ceasing the collection of unlawful amounts from Plaintiffs and the putative class members.

114. Indeed, the TLEs are each a created by a tribal charter, issued in the name of the Tribal Council Defendants and easily revoked by them.

115. Upon information and belief—and based on discovery in other tribal lending cases against nearly identical schemes—the Tribal Council Defendants have been instrumental in facilitating the creation of the illegal lending business and each agreed to the collection of unlawful debt and conspired with the others herein to collect the unlawful debt from consumers.

116. Upon information and belief—and based on discovery in other tribal lending cases against nearly identical schemes—the Tribal Council Defendants have each signed ordinances and participated in decisions with respect to the lending businesses—although it is likely that most of the day-to-day operations are outsourced to third parties who are not members of the Tribe.

117. As evidenced by the creation and operation of the TLEs, the Tribal Council Defendants have attended meetings related to the high-interest usurious loans offered by the Tribal Lending Entities, and have each voted in favor of their making and collection of the usurious loans.

118. Although the Tribe holds itself out as the actual lender of these internet loans, a substantial amount of the money comes from third party investors who enter into servicing and loan and security agreements with the Tribe, which must be approved by the Tribal Council.

119. Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities.

120. Upon information and belief, the Tribe has relied on these agreements to delegate much of the operations of the TLEs to outside entities and individuals, the identities of whom will be revealed through discovery.

121. Although the Tribal Council Defendants have ultimate control over the TLEs, these non-tribal outsiders primarily run the day-to-day operations of the entities and provide the necessary funding, underwriting, servicing, and collection services for the TLEs, while the Tribal Council Defendants provide the tribal façade that is key to allowing each TLE to claim immunity from state usury regulations.

122. Indeed, although purporting to operate Post Lake, White Pine, and Advance Loan from the Tribe's reservation in Wisconsin, the website for each entity is registered to an entity in Tempe, Arizona.

123. The P.O. Box address listed on Post Lake's wage assignments letters is also located in Arizona and is associated with Valley Servicing, an entity established by a different Native American tribe, the Oglala Sioux. The Oglala Sioux tribe is in turn located on a reservation in South Dakota.

124. Valley Servicing is also not even run by the tribe with which it claims an affiliation, but is instead operated, upon information and belief, by a non-tribal entity, Red Cypress Group, and a non-tribal individual, Ashley Blake Collins, out of Arizona.

125. In other words, the servicing (including collections) of the loans issued by the TLEs is not actually carried out by the Tribe or tribal members—or even other individuals employed by the Tribe on its own reservation—but is conducted by other entities and individuals on non-tribal lands far from the Tribe's reservation in Wisconsin.

126. And tellingly, the Tribe's own website omits Post Lake, White Pine, and Advance Loan from its listing of employment opportunities, while it prominently mentions opportunities to work at the Tribe's casino.[8]

---

[8] https://sokaogonchippewa.com/our-history/careers/ (last visited June 3, 2026).

127. Through their participation in the lending enterprise, as well as their knowing facilitation of the scheme, the Tribal Council Defendants, along with their yet-to-identified coconspirators, have violated RICO, as well as state usury and consumer protection laws.

**F.** **Plaintiffs were charged usurious interest on their loans.**

128. Defendants—together with others not yet known to Plaintiffs—marketed, initiated, and collected usurious loans throughout the country, including in California, Florida, Missouri, and Kentucky, as well as other states with similar usury protections.

129. Defendants knew the loans were illegal under state usury and licensing laws, but they pursued the scheme anyway.

130. They charged astronomical interest rates that far exceeded the rates allowed by applicable state laws.

131. Upon information and belief and based on Plaintiffs' experiences, as well as the TLE's websites, all of Defendants' loans to consumers imposed interest rates far exceeding applicable state laws.

132. Accordingly, the loans were and are null and void under applicable state law, and it is unlawful for the Tribal Council Defendants, Post Lake, White Pine, Advance Loan, or any of their yet-to-be-identified non-tribal coconspirators to collect or receive any interest (or even principal in some states) or other charges on said loans, including any amounts paid by Plaintiffs.

**1.** **Plaintiff Jessie Espinoza**

133. For example, in September 2024, Plaintiff Jessie Espinoza received a loan from Post Lake in the amount of $1,500, which had an interest rate of 777.86%. And in May 2025, Mr. Espinoza received a loan from White Pine for $600 with an interest rate of 100%.

134.     Plaintiff Espinoza made payments on both loans and paid more than he borrowed on at least the Post Lake loan.  His White Pine loan also still has an outstanding balance.

135.     Plaintiff Espinoza used his California address when applying for the loans, and he used his California bank account with a California ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 2.     Plaintiff Austin Bushong

136.     Plaintiff Austin Bushong obtained a loan from Advance Loan in March 2026 for $500, which had an interest rate of 652.14%.

137.      Plaintiff Bushong made payments on this loan.   The loan also still has an outstanding balance.

138.     Plaintiff Bushong used his California address when applying for the loans, and he used his California bank account with a California ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 3.     Plaintiff Julian Griffin

139.     In October 2024, Plaintiff Julian Griffin obtained a loan from Post Lake for $1,500, which imposed an interest rate of 769.01%.

140.     Plaintiff Griffin made payments on this loan.  The loan also still has an outstanding balance.

141.     Plaintiff Griffin used his Florida address on his loan application, and he used his Florida bank account with a Florida ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 4. Plaintiff Md Jahirul Islam

142. Between December 2022 and June 2023, Plaintiff Md Jahirul Islam applied for and received seven loans from Post Lake, each of which imposed interest rates over 600%.

143. Plaintiff Islam made payments on each of these loans. The loans also still have an outstanding balance.

144. Plaintiff Islam used his Missouri address on his loan application, and he used his Missouri bank account with a Missouri ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

### 5. Plaintiff Rubin Stone

145. Plaintiff Rubin Stone applied for and obtained a loan from Post Lake in August 2025 for $300, which imposed an interest rate of 777.83%.

146. Plaintiff Stone made payments on this loan.

147. Plaintiff Stone used his Kentucky address on his loan application, and he used his Kentucky bank account with a Kentucky ABA routing number to receive the loans and for the subsequent ACH debits made to pay down the loans.

* * *

148. As outlined above, the loans issued to Plaintiffs violated the respective usury statutes of each of their home states and entitle Plaintiffs to the remedies provided under their respective state laws, including avoidance of the loans and repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.

149. Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here.[9]

---

[9] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be

150. Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

---

void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM: ALL PLAINTIFFS AGAINST THE JOHN DOE DEFENDANTS FOR DAMAGES)

151.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

152.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Damages Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any TLE; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming; and (3) made payments on their loan.

All Plaintiffs are members of this class.

153.    Pursuant to Rule 23, Plaintiffs (except Plaintiff Bushong) also bring this claim on behalf of themselves and the following subclass (the "Post Lake Damages Subclass"):

> All natural persons who: (1) entered into a loan agreement with Post Lake; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming; and (3) made payments on their loan.

All Plaintiffs except Plaintiff Bushong are members of this subclass.

154.    Pursuant to Rule 23, Plaintiff Espinoza also brings this claim on behalf of himself and the following subclass (the "White Pine Damages Subclass"):

> All natural persons who: (1) entered into a loan agreement with White Pine; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas,

Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming; and (3) made payments on their loan.

Plaintiff Espinoza is a member of this subclass.

155.    Pursuant to Rule 23, Plaintiff Bushong also brings this claim on behalf of himself and the following subclass (the "Advance Loan Damages Subclass"):

> All natural persons who: (1) entered into a loan agreement with Advance Loan; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming; and (3) made payments on their loan.

Plaintiff Bushong is a member of this subclass.

156.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

157.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether the John Doe Defendants conducted or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for

purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against each John Doe Defendant.

158. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

159. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

160. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to

the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

161. All of the loans made to consumers throughout the United States (except Utah and Nevada), included an interest rate far in excess of twice the enforceable rate in the consumers' respective states of residence.

162. As alleged above, Defendants associated with an enterprise (the Usurious Lending Enterprise) that existed for the purpose of collection of unlawful debt, agreed that the enterprise would engage in the collection of unlawful debt, and participated in the affairs of the enterprise.

163. The Usurious Lending Enterprise is an association-in-fact enterprise comprised of the Tribal Council Defendants and the John Doe Defendants who invested in, operated, and reaped the benefits of the TLEs.

164. Alternatively, each of the TLEs are enterprises under 18 U.S.C. § 1691(4) because they are each limited liability companies.

165. The John Doe Defendants' participation in the Usurious Lending Enterprise and/or TLEs violated § 1962(c) of RICO and caused Plaintiffs and the RICO Damages Class members to repay amounts on unlawful loans.

166. Plaintiffs and the RICO Damages Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest and principal on loans made by the Usurious Lending Enterprise which would not have been made but for Defendants' conduct.

167. Accordingly, the John Doe Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Damages Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM: ALL PLAINTIFFS AGAINST THE TRIBAL COUNCIL**
**DEFENDANTS FOR INJUNCTIVE RELIEF IN THEIR OFFICIAL CAPACITIES**
**ONLY)**

168. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

169. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Injunctive Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any TLE; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming.

All Plaintiffs are members of this class.

170. Pursuant to Rule 23, Plaintiffs (except Plaintiff Bushong) also bring this claim on behalf of themselves and the following subclass (the "Post Lake Injunctive Subclass"):

> All natural persons who: (1) entered into a loan agreement with Post Lake; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming.

All Plaintiffs except Plaintiff Bushong are members of this subclass.

171. Pursuant to Rule 23, Plaintiff Espinoza also brings this claim on behalf of himself and the following subclass (the "White Pine Injunctive Subclass"):

> All natural persons who: (1) entered into a loan agreement with White Pine; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut,

District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming.

Plaintiff Espinoza is a member of this subclass.

172. Pursuant to Rule 23, Plaintiff Bushong also brings this claim on behalf of himself and the following subclass (the "Advance Loan Injunctive Subclass"):

All natural persons who: (1) entered into a loan agreement with Advance Loan; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, West Virginia, or Wyoming; and (3) made payments on their loan.

Plaintiff Bushong is a member of this subclass.

173. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

174. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether Defendants conducted or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of

RICO; and (4) what is the proper prospective relief for Plaintiffs and the class members against each Defendant.

175. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

176. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

177. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to

the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

178. All of the loans made to consumers throughout the United States (except Utah and Nevada), included an interest rate far in excess of twice the enforceable rate in the consumers' respective states of residence.

179. As alleged above, Defendants associated with an enterprise (the Usurious Lending Enterprise) that existed for the purpose of collection of unlawful debt, agreed that the enterprise would engage in the collection of unlawful debt, and participated in the affairs of the enterprise.

180. The Usurious Lending Enterprise is an association-in-fact enterprise comprised of the Tribal Council Defendants and the John Doe Defendants who invested in, operated, and reaped the benefits of the TLEs.

181. Alternatively, each of the TLEs are enterprises under 18 U.S.C. § 1691(4) because they are limited liability companies.

182. The Tribal Council Defendants' participation in the Usurious Lending Enterprise and/or each TLE violated § 1962(c) of RICO.

183. Accordingly, Plaintiffs seek an injunction against the Tribal Council Defendants to prevent the continued collection or attempted collection of the disputed debts from the RICO Injunctive Class and subclasses, including indirect collection through reporting of the debts on credit reports, pursuant to 18 U.S.C. § 1964 and *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001).

**COUNT THREE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM: ALL PLAINTIFFS AGAINST THE JOHN DOE DEFENDANTS FOR**
**DAMAGES, AND BY ALL PLAINTIFFS AGAINST THE TRIBAL COUNCIL**
**DEFENDANTS IN THEIR OFFICIAL CAPACITIES ONLY FOR INJUNCTIVE**
**RELIEF)**

184. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

185. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of the same RICO Damages Class, RICO Injunctive Class, and the respective subclasses of each as alleged in Counts One and Two.

186. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

187. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether there was a conspiracy to collect unlawful debt; (3) at what point each defendant joined the conspiracy; (4) whether the loans are "unlawful debt" for purposes of RICO; and (5) what is the proper recovery for Plaintiffs and the class members against each Defendant.

188. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3)**. Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

189. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

190. As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(b)-(c), including but not limited to: (1) various loan and security agreements with third party investors; (2) agreements related to the purchasing of shares with respect to the unlawful loans; and (3) authorization of the usurious loan agreements entered into with Plaintiffs and other class members.

191. Defendants conspired and agreed to advance a RICO undertaking and caused Plaintiffs to repay amounts on unlawful loans.

192. Plaintiffs and the RICO Damages Class and subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the Usurious Lending Enterprise and/or the individual TLEs, respectively, in the same manner and to the same extent as pled in Count One.

193. Further, Plaintiffs and the RICO Injunctive Class and subclass members are entitled to injunctive relief against further direct and indirect collection of their unlawful debts.

**COUNT FOUR:**
**VIOLATIONS OF CALIFORNIA FINANCING LAW,**
**CAL. FIN. CODE § 22000, *ET SEQ.***
**(CLASS CLAIM BY PLAINTIFFS ESPINOZA AND BUSHONG FOR INJUNCTIVE**
**RELIEF AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL**
**CAPACITIES)**

194. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

195. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Espinoza and Bushong bring this claim for themselves and on behalf of a class initially defined as follows (the "California Class"):

> All individuals who: (1) entered into a loan agreement with any TLE; (2) while located in California; and (3) have an outstanding balance on their loan(s).

196. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

197. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

198. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute

the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

199. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate California Financing Law; (2) whether those violations were willful; and (3) whether and to what extent Plaintiffs are entitled to injunctive relief.

200. **<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

201. **<u>Injunctive Relief Appropriate for the Class</u>. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the

class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

202. Upon information and belief, the Tribal Council Defendants, through their official control over and creation of the TLEs, willfully issued loans to Plaintiffs Espinoza and Bushong and the class members that contracted for interest well in excess of the usury cap under the California Financing Law.

203. They further willfully violated the California Financing Law by knowingly disregarding the requirement that they first obtain a license to issue consumer loans.

204. Indeed, upon information and belief, the Tribal Council Defendants were aware or should have known that California, like most other states, requires lenders to first obtain a license before issuing consumer loans like those issued by the TLEs in this case. They also knew that California capped the interest rate on such loans.

205. Despite this knowledge, the Tribal Council Defendants created, approved, and continued the operations of the TLEs—which would not exist or continue to operate but for their sanction—including the ongoing collection of the loans issued to Plaintiffs and the class members.

206. Defendants' willful violations of the California Financing Law render the loan contracts entered with Plaintiffs Espinoza and Bushong and the class members void, and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750(a) and (b).

207. Plaintiffs Espinoza and Bushong and the class members will be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

208.    Accordingly, Plaintiffs Espinoza and Bushong and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

**COUNT FIVE:**
**VIOLATIONS OF FLORIDA CONSUMER FINANCE ACT,**
**FLA. STAT. § 516.001, *ET SEQ.***
**(CLASS CLAIM BY PLAINTIFF GRIFFIN FOR INJUNCTIVE RELIEF AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

209.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

210.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Griffin brings this claim for himself and on behalf of a class initially defined as follows (the "Florida Class"):

> All individuals who: (1) entered into a loan agreement with any TLE; (2) while located in Florida; and (3) have an outstanding balance on their loan(s).

211.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

212.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

213.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute

the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

214. **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Florida Consumer Finance Act; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

215. **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

216. **Injunctive Relief Appropriate for the Class**. **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the

class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

217. The Tribal Council Defendants violated the Florida Consumer Finance Act by engaging in the business of making consumer finance loans within Florida without a license or other authorization under Florida law to do so.

218. Neither the Tribal Council Defendants, nor any John Doe Defendant or TLE, ever obtained a license to issue consumer loans within Florida.

219. In addition to failing to obtain a license, Defendants also issued loans to Plaintiff Griffin and the class members with interest rates far exceeding 18 percent, in further violation of the Florida Consumer Finance Act.

220. Because Defendants charged excessive interest rates on consumer loans that they issued without a license under Florida law, the loans are void and unenforceable under the Florida Consumer Finance Act, and Defendants, in the official capacities through which they control the TLEs, have not right to collect on the loans.

221. Plaintiff Griffin and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

222. Accordingly, Plaintiff Griffin and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

**COUNT SIX:**
**VIOLATIONS OF MISSOURI SMALL LOANS ACT,**
**MO. ANN. STAT. §§ 408.500, ET SEQ.**
**(CLASS CLAIM BY PLAINTIFF ISLAM FOR INJUNCTIVE RELIEF AGAINST THE**
**TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

223. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

224. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Islam brings this claim for himself and on behalf of a class initially defined as follows (the "Missouri Class"):

> All individuals who: (1) entered into a loan agreement with any TLE; (2) while located in Missouri; and (3) have an outstanding balance on their loan(s).

225. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

226. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

227. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

228. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Missouri's usury and small loan statutes; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

229. **<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

230. **<u>Injunctive Relief Appropriate for the Class</u>. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

231. Upon information and belief, the Tribal Council Defendants, through their official control over and creation of the TLEs, issued loans to Plaintiff Islam and the class members that far exceeded Missouri's applicable usury rate cap without a license to issue such loans from the Missouri Division of Finance.

232. The loans issued to Plaintiff Islam and the class members are thus "void" under Missouri law, and the Tribal Council Defendants, through their control of the TLEs, cannot collect or enforce any rights under the loan contracts with Plaintiff Islam and the class members.

233. Plaintiff Islam and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

234. Accordingly, Plaintiff Islam and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection and receipt of any amounts on the subject loans.

<u>COUNT SEVEN:</u>
**VIOLATIONS OF KENTUCKY FINANCIAL SERVICES CODE,
KY REV. STAT. § 286.4-410, *ET SEQ.*
(CLASS CLAIM BY PLAINTIFF STONE FOR INJUNCTIVE RELIEF AGAINST THE
TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

235. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

236. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Stone brings this claim for himself and on behalf of a class initially defined as follows (the "Kentucky Class"):

All individuals who: (1) entered into a loan agreement with any TLE; (2) while located in Kentucky; and (3) have an outstanding balance on their loan(s).

237. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and

addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

238. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

239. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

240. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Kentucky's Financial Services Code; and (2) whether and to what extent Plaintiffs are entitled to injunctive relief.

241. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

242. **Injunctive Relief Appropriate for the Class.** **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

243. Upon information and belief, the loans issued to Plaintiff Stone and the class members were each for $15,000 or less and had interest rates in excess of Kentucky's usury limit of 19%.

244. Neither the Tribal Council Defendants, nor any John Doe Defendant or TLE, ever obtained a license to issue loans for $15,000 or less with interest greater than the permissible limit.

245. Because Defendants and the TLEs charged excessive interest rates on small dollar loans that they issued without a license under Kentucky law, the loans are void and unenforceable, and the Tribal Council Defendants, through their control over the TLEs, "have no right to collect any principal, charges or recompense whatsoever" on the loans.

246. Plaintiff Stone and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined in their official capacities.

247. Accordingly, Plaintiff Stone and the putative class members are entitled to injunctive relief against the Tribal Council Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by the TLEs.

**COUNT EIGHT:**
**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**
**(CLASS CLAIM BY ALL PLAINTIFFS AGAINST THE TRIBAL COUNCIL**
**DEFENDANTS IN THEIR OFFICIAL CAPACITIES ONLY)**

248. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

249. Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

250. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with any TLE; (2) from Maryland, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, North Carolina, Idaho, Illinois, Kansas, Minnesota, New York, New Mexico, Oregon, Rhode Island, South Dakota, South Carolina, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan(s).

251. Maryland, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, North Carolina, Idaho, Illinois, Kansas, Minnesota, New York, New Mexico, Oregon, Rhode Island, South Dakota, South Carolina, Texas, West Virginia, or Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

252. The TLEs were not licensed to make loans in Maryland, Virginia, Georgia, Florida, Alabama, Arizona, Arkansas, California, Connecticut, North Carolina, Idaho, Illinois, Kansas,

Minnesota, New York, New Mexico, Oregon, Rhode Island, South Dakota, South Carolina, Texas, West Virginia, or Wisconsin.

253. Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

254. Plaintiffs and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

255. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

256. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

257. Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are invalid and the loans are uncollectable. Plaintiffs also seek to enjoin the Tribal Council Defendants, in their official capacities, from allowing collection on the loans.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(2) and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying class

members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged herein;

D. An Order providing for any and all injunctive relief the Court deems appropriate;

E. An Order declaring the loans of the Void Debt Class void and uncollectable;

F. An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

G. An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

H. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I. An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

J. Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Thomas Scott-Railton*
Thomas Scott-Railton
Attorney Bar Number: 5687330
Attorney for Plaintiffs
**GUPTA WESSLER LLP**
Email: thomas@guptawessler.com
2001 K Street NW, Suite 850 North
Washington, DC 20001
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

Kristi Cahoon Kelly*
Andrew J. Guzzo*
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Counsel for Plaintiffs*
*\*Applications for admission forthcoming*

55